# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Richard William Plate, Administrator          Case No. 3:15CV1699
  of the Estate of Scott Allyn Plate,

        Plaintiff

      v.                                          **ORDER**

Charles Johnson, et al.,

        Defendants

       This case under 42 U.S.C. § 1983 arises from the death of Scott Allyn Plate (Scott), a detainee at the Lucas County, Ohio, Jail who died while in custody.

       In August, 2013, officers from the Toledo Police Department arrested Scott twice within a seven-hour span. After the second arrest, officers booked Scott into the county jail pending his arraignment. There, according to the complaint, Scott told jail officials that he suffered from a seizure disorder. He also told defendant Charles Johnson, a Deputy Sheriff, that he felt a seizure coming on, but Johnson failed to secure medical treatment. Scott died in his cell.

       Two years later, Scott's father Richard Plate (Richard) applied to the Probate Court of Sandusky County, Ohio, for authority to administer his son's estate.

       Under Ohio law, only the probate court of the county in which a decedent resided at the time of death may appoint an administrator. O.R.C. § 2113.01; *State ex rel. Lee v. Trumbull Cnty. Probate Court*, 83 Ohio St. 3d 369, 372–73 (1998). Richard's application stated that his

son resided at Richard's home in Sandusky County, and the probate court appointed Richard as the administrator.

Richard then filed this § 1983 suit in his capacity as the estate administrator. He alleges that Johnson was deliberately indifferent to Scott's medical needs, and that Lucas County and its Sheriff are liable for the constitutional violation under the rule of *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Pending is the defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction. (Doc. 59).

The gravamen of the motion is that Scott did not, in fact, reside in Sandusky County at the time of his death. Defendants argue that the Sandusky County Probate Court therefore had no power to appoint Richard to administer the estate, that the estate is "void *ab initio*, and in turn this Court has no subject matter jurisdiction over the pending action." (Doc. 60 at 24).

Because the validity of the appointment order affects only Richard's capacity to sue, and not my subject-matter jurisdiction, I deny the motion to dismiss. I also order further briefing as described below.

## Background

### A. Scott's Residency

Scott Plate was born in Adrian, Michigan. (Doc. 63 at 93).

After attending college in Iowa, Scott returned to Michigan and, in 1995, married Kathleen Jiles. (*Id.* at 96). They lived together in Jackson County, Michigan, until early 2009, when their divorce proceedings concluded. (*Id.* at 38). (Before the divorce decree issued, Scott also lived for a period of time with his mother, Susan Plate, in Brooklyn, Michigan. (Doc. 73–6 at 24)). A significant factor in the couple's divorce was Scott's alcoholism. (Doc. 73–6 at 21).

2

Sometime in 2010, Scott moved into his father's home in Bellevue, a city in Sandusky County, Ohio. (Doc. 73–6 at 24). Scott had his own apartment in the house. (*Id.*). According to Richard, Scott kept important documents – tax returns, court orders relating to his child-support obligations, his college diploma – at the Bellevue residence. (*Id.* at 15).

Between 2010 and 2012, Scott lived at different times: 1) with his mother in Brooklyn, Michigan; 2) with his father in Bellevue, Ohio; 3) in various places in Port Clinton, Ohio and Sandusky, Ohio (which is the seat of Erie County, Ohio); and 4) at homeless shelters in Ohio and Michigan. (Doc. 73–6 at 35, 36). Scott also spent time at a number of rehabilitation facilities, receiving treatment for his drinking problem.

It appears that, in early 2012, Scott was living in Jackson County, Michigan. In January, for example, he spent time in the Jackson County jail after an arrest for not paying child support. (Doc. 63 at 65). The next month, Scott was badly injured in a fight in Jackson, Michigan. He spent three weeks at the University of Michigan Hospital, in Ann Arbor, after undergoing a hemicraniectomy. (*Id.* at 71–72).

In late February, 2012, Scott moved into the Arbors of Waterville, a rehabilitation facility in Waterville, Lucas County, Ohio. When he checked in, he gave his "last permanent address" as his mother's home in Brooklyn, Michigan. (*Id.* at 77). Scott remained at the Arbors until April 4, 2013, when he moved back to his father's home in Bellevue. He lived with Richard for only two weeks. He left Bellevue, took a job in Michigan, and moved into his mother's home in Brooklyn. (Doc. 63 at 16–17).

After the move, Scott returned to the Bellevue house only twice before his death: once to show his father his new car, and once to visit with his new boss. (*Id.* at 17).

Back in Michigan, meanwhile, Scott received mail at his mother's house, opened a bank account at a Bank of America branch in Brooklyn (Doc. 63 at 121, 123), and bought and registered a car in Brooklyn (*id.* at 136, 138, 144). All of the paperwork associated with these events indicates that Scott considered his then-current address to be his mother's home in Brooklyn. Then, in early June, 2013, sheriff's deputies arrested Scott in Jackson, Michigan, for operating a vehicle while intoxicated. (*Id.* at 84).

From that date until Scott's death in late August, Scott's dwelling place becomes harder to pin down.

Between June and August, 2013, Scott was hospitalized several times in Toledo and Port Clinton for issues relating to his alcoholism. (*Id.* at 116) (June 18, 2013 hospitalization in Toledo); (*id.* at 168) (August 4, 2013 hospitalization in Port Clinton); (*id.* at 157–60) (emergency medical assistance provided in Toledo on August 11, 2013). Associated medical records indicated that Scott was either "homeless" (*id.* at 169), did not have a "local residence" (*id.* at 168), or had "mov[ed] out of state" – i.e., moved out of Ohio (*id.* at 116). Documentary evidence also establishes that he spent the nights of July 31, August 1, and August 2 at a motel in Port Clinton. (*Id.* at 172–73).

When, on August 24, 2013, Toledo police officers twice arrested and twice brought Scott to the Lucas County Jail, Scott told the jail's intake officer that he lived in Brooklyn, Michigan. (Doc. 60 at 10; *see also* Doc. 60, Exh. N).

At the same time, Scott also told the officer that his name was "Eric Plate," which is his brother's name. (Doc. 91 at 12). It also appears that Scott was intoxicated at the time of his first arrest. As defendants concede, "he spent 4 hours in the detox cell" after that arrest, which involved charges of public intoxication. (Doc. 60 at 6–7).

4

## B. Probate Proceedings

On August 18, 2015, Richard, acting through counsel – and apparently believing that Scott was a Sandusky County resident when he died – applied to the Sandusky County Probate Court for authority to administer his son's estate. (Doc. 63 at 28–30).

Richard's application, which stated that Scott resided at Richard's home in Bellevue, advised the probate court that:

> This estate is being opened solely to pursue a potential wrongful death claim. The estate has no assets or liabilities to be probated. The case is rapidly approaching the statute of limitations and counsel needs to file the case no later than August 25, 2015. This case was just brought to counsel last week on Friday, August 7.

(*Id.* at 29).

The application represented that the beneficiaries of Scott's estate knew about the probate proceeding and the anticipated wrongful-death claim. (*Id.*). Likewise, Scott's mother and his three children (acting through their mother, Scott's ex-wife Kathleen) waived their rights to administer the estate. (*Id.* at 30).

In an order filed on August 20, the Probate Court appointed Richard the administrator of Scott's estate and issued him letters of authority. (Doc. 91–2 at 2). Richard then brought this suit on August 24, one day before the two-year limitations period for the § 1983 claims expired. *See Ferrito v. Cuyahoga Cnty.*, 2018 WL 1757410, *3 (N.D. Ohio 2018) (Boyko, J.).

As far as the Probate Court's online docket indicates, that court is unaware of the dispute that has arisen in this case about the validity of the appointment order.

## Standard of Review

Defendants purport to bring a factual attack on my subject-matter jurisdiction to adjudicate this case. (Doc. 60 at 10–13).

"A factual attack . . . raises a factual controversy requiring the district court to weigh the conflicting evidence to arrive at the factual predicate that subject-matter [jurisdiction] does or does not exist." *Wayside Church v. Van Buren Cnty.*, 847 F.3d 812, 817 (6th Cir. 2017) (internal quotation marks omitted). In such a case, "the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Gentek Bldg. Prods, Inc. v. Sherwin-Williams, Co.*, 491 F.3d 320, 330 (6th Cir. 2007).

The "factual controversy" that supposedly affects my subject-matter jurisdiction here is Scott's residence at the time of his death.

In *State ex rel. Lee*, *supra*, 83 Ohio St. 3d at 372–73, the Ohio Supreme Court characterized O.R.C. § 2113.01, which governs the appointment of administrators for an intestate decedent's estate, as a grant of subject-matter jurisdiction to the probate court to administer the estates of only those decedents who reside within the county at the time of their deaths.

Accordingly, if Scott did not reside in Sandusky County when he died, then the Sandusky County Probate Court had no jurisdiction over his estate. Consequently, the order appointing Richard to administer Scott's estate would, under Ohio law, be "void, i.e., a legal nullity." *Black v. Aristech Chem. Co.*, 2008-Ohio-7038, ¶23 (Ohio App.). And the defendants could collaterally attack the order here. *Id.* at ¶24 (because the probate court "appointed appellant the administrator of a non-resident decedent's estate," the appellee "could collaterally attack the judgment [appointing an administrator] in a separate and distinct proceeding").

But even if all of the foregoing were true, would that mean that I lack subject-matter jurisdiction over this case?

As I explain below, the answer is "No." That Richard's appointment order may be a nullity under Ohio law calls into question his capacity to sue, not my subject-matter jurisdiction.

6

Nevertheless, both sides took extensive discovery on the factual issue at the heart of the defense motion: Scott's residence at the time of his death. It included the depositions of Scott's parents, ex-wife, and children, as well as written discovery relating to Scott's various dwelling places from roughly 2008 until his death in August, 2013. (Doc. 63; Doc. 73–1 through 21).

These materials have squarely presented the question of whether Scott was a Sandusky County resident when he died. I therefore conclude that both sides had a full and fair opportunity to address the "factual predicate," *Wayside Church*, *supra*, 847 F.3d at 817, on which my subject-matter jurisdiction supposedly depends, and, subject to such further proceedings as I describe below, the present record is sufficient for me to address that question.[1]

## Discussion

### A. Subject-Matter Jurisdiction

"[S]ubject-matter jurisdiction . . . refers to a tribunal's power to hear a case[.]" *U.S. v. Satterwhite*, 893 F.3d 352, 356 (6th Cir. 2018). It means "adjudicatory competence over a category of disputes." *Wisconsin Valley Improvement Co. v. U.S.*, 569 F.3d 331, 333 (7th Cir. 2009).

#### 1. Federal-Question Jurisdiction Exists

Federal district courts have subject-matter jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. "[A] case arises under federal law when federal law creates the cause of action asserted." *Gunn v. Minton*, 568 U.S. 251, 257 (2013).

---

[1] I deny Richard's request for an evidentiary hearing on this issue. (Doc. 91 at 35). Richard asks for an opportunity "to present additional evidence," but he does not say (or even hint at) what that evidence consists of. In any event, the depositions of the key witnesses with knowledge of Scott's whereabouts in the weeks and months before his death, and the documentary evidence supporting or undermining those witnesses' accounts, provides an adequate basis for resolving the question.

Richard's complaint on behalf of Scott's estate alleges § 1983 claims that invoke this court's federal-question jurisdiction.

Richard alleges that Scott suffered from serious medical conditions (alcoholism and a seizure disorder), that defendant Johnson, among others, knew of Scott's seizure disorder, and that Johnson deliberately failed to provide needed medical care to Scott, a detainee in his care.

Such a claim is cognizable under the Fourteenth Amendment. *Ruth v. Spears*, 589 F.3d 249, 254 (6th Cir. 2009) ("Pretrial detainees have a right under the Fourteenth Amendment to adequate medical treatment, a right that is analogous to the right of prisoners under the Eighth Amendment."). Furthermore, such a claim, and the municipal-liability claim directed at Lucas County and the Lucas County Sheriff, may be the subjects of a § 1983 suit. *See id.* at 254–57 (considering these exact claims in a § 1983 action).

Defendants nevertheless insist that I lack subject-matter jurisdiction because the order appointing Richard to administer Scott's is allegedly void.

According to the defense, Scott's estate "was not created in compliance with Ohio law, and . . . any actions filed on behalf of the estate are a nullity." (Doc. 60 at 6). "As a result," defendants continue, "this case must be dismissed, as this Court has no subject matter jurisdiction over the pending claims." (*Id.*).

As just discussed, however, I do have subject-matter jurisdiction "over the pending claims," which fall within my federal-question jurisdiction.

Defendants' challenge, then, is not really a challenge to my subject-matter jurisdiction over this § 1983 action, but to Richard's power to maintain this suit in light of the evidence suggesting that Scott did not reside in Sandusky County at the time of his death. Framed that way, defendants' challenge arguably raises a question of standing, and "[w]hether a party has

standing *is* an issue of the court's subject-matter jurisdiction[.]" *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017) (internal emphasis supplied).

## 2. Scott's Estate Has Standing

Article III, § 2 of the Constitution authorizes the federal courts to hear only "Cases" and "Controversies."

"Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1547 (2016). The doctrine "seeks to ensure the plaintiff has a personal stake in the outcome of the controversy." *Sumpter v. Wayne Cnty.*, 868 F.3d 473, 490 (6th Cir. 2017).

The "irreducible constitutional minimum of standing consists of three elements. The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, *supra*, --- U.S. at ---, 136 S. Ct. at 1547 (internal citations and quotation marks omitted).

To the extent that defendants' motion raises an argument that either Richard or Scott's estate lacks standing, that argument would lack merit.

First, whether Richard has standing is irrelevant.

Richard brought this action in his representative capacity, as the administrator of his son's estate. (Doc. 1 at 1). This was entirely proper, for "'only the purported victim, or his estate's representative(s), may prosecute a section 1983 claim.'" *Smith v. Jones*, 2014 WL 12591694, *2 (N.D. Ohio 2014) (Oliver, J.) (quoting *Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000)).

When an administrator like Richard brings a § 1983 action, moreover, he "sues not to obtain a remedy for an injury done to him . . . personally; rather, a personal representative sues

on behalf of an estate." *Estate of Reed v. Ponder*, 2012 WL 1031487, *4 (M.D. Ala. 2012). Therefore, my jurisdiction does not turn on whether Richard personally suffered an injury in fact.

Second, Scott's estate has standing.

A decedent's estate is "an aggregate comprising the assets and liabilities of the decedent." *State ex rel. Liposchak v. Indus. Comm'n of Ohio*, 90 Ohio St. 3d 276, 284 (2000) (citing BLACK'S LAW DICTIONARY 567 (7th ed. 1999)). "An estate cannot sue or be sued; any action for against it must be brought by or against the executor or personal representative of the decedent." *West v. West*, 1997 WL 559477, *5 (Ohio App. 1999) (citing 34 Ohio Jur. 2d (1982) 271, Decedents' Estates, § 1877).

But a decedent's estate can incur an injury, as Ohio law recognizes.

"[A] decedent's estate" itself "may recover for injuries suffered by the decedent before his death" by prosecuting a survival claim. *Peters v. Columbus Steel Castings Co.*, 115 Ohio St. 3d 134, 137 (2007). This survival claim, moreover, is the predicate on which an Ohio decedent's (or his estate's) § 1983 claim rests (though, unlike the state-law survival claim, the § 1983 claim permits recovery for damages caused by the decedent's death itself). *See generally Jaco v. Bloechle*, 739 F.2d 239, 241–45 (6th Cir. 1984).

In this case, Scott's estate suffered injuries in fact – Scott's death as well as the injuries Scott suffered before he died – and it seeks, through its administrator, to recover the damages arising from those injuries that are traceable to defendants' conduct. Accordingly, the estate has Article III standing.

My conclusion is consistent with a persuasive district court opinion that addressed an estate's Article III standing in a § 1983 case, *Fletcher v. City of New London*, 2017 WL 690533 (D. Conn. 2017).

*Fletcher* stemmed from the death of a man named Gilbert while in police custody. After a state probate court appointed two relatives to administer Gilbert's estate, "the initial complaint in th[e] case was filed, naming 'Estate of [Mr.] Gilbert' as the plaintiff." *Id.* at *2. The defendants moved to dismiss for lack of subject-matter jurisdiction, contending that the estate lacked standing to sue. *Id.*

The district court rejected the argument. After explaining that the defendants' argument conflated the concept of the estate's standing with its capacity to sue, *id.* at *3, the court held that the estate had Article III standing because it suffered an injury in the form of damages from Gilbert's death:

> Here, while the Estate lacked capacity and was not the real party in interest, it did have standing under Article III of the U.S. Constitution: it sought redress in the form of damages from the death of Mr. Gilbert, an "injury in fact" "fairly traceable" to the actions of the defendants.

*Id.* at *6 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).

Other courts have likewise held that an estate had Article III standing to pursue claims for violations of federal law.

For example, in *Estate of Ponder*, *supra*, 2012 WL 1031487, the decedent's estate filed a complaint alleging that a former employer violated the decedent's rights under the Americans with Disabilities Act, and that the violation contributed to the decedent's death. Defendants moved to dismiss, arguing that estate "has no standing to bring this action because, under Alabama law, the personal claims of a decedent which existed prior to . . . her death . . . survive in favor of the decedent's personal representative[.]" *Id.* at *4.

The district court disagreed. Because "the Estate itself could trace a direct injury" – the decedent's death – "to the alleged acts of the defendants," the court held that "the Estate has

11

standing." *Id.*[2]; *see also Werner v. Potter*, 2006 WL 839156, *23 (E.D. Wisc. 2006) ("Under traditional Article III analysis, the estate appears to have standing insofar as it stands in the shoes of the decedent who is alleged to have suffered an injury in fact."); *cf. Koho v. Forest Labs, Inc.*, 2015 WL 11198941, *2 (W.D. Wash. 2015) (holding, in the context of a state-law survivorship claim, that "a decedent's estate can be injured by harms that a defendant inflicts on the decedent while the decedent is alive," and that the estate therefore "suffered injury in fact" sufficient for Article III purposes).

Defendants are likely to respond that Scott's estate could not suffer an injury in fact because the estate never existed.

According to the defendants, "[t]he single most fundamental aspect of every action brought by the estate of a deceased individual lies in the creation of the estate itself." (Doc. 60 at 13). In their view, it is impossible to "create a lawful estate" if the administrator fails to "open and obtain letters of authority for an 'intestate' estate in the county [a] decedent resides at the time of death." (*Id.* at 15) (citing O.R.C. § 2113.01). Because Richard purported to open the estate in Sandusky County, where Scott allegedly did not reside, defendants contend that Richard did not "properly create an estate[.]" (*Id.* at 15).

These arguments lack merit.

As noted above, an estate is simply the name the law gives to a decedent's collection of assets and liabilities. *State ex rel. Liposchak*, *supra*, 90 Ohio St. 3d at 284. Among the assets that a decedent's estate possesses, moreover, is a survivor claim for injuries that the decedent incurred before the decedent's death. *Peters*, *supra*, 115 Ohio St. 3d at 136–37. Furthermore, it

---

[2] The court also concluded, as did the court in *Fletcher*, *supra*, and as I do, *infra*, that "the Estate's ability to assert the claims in the amended complaint is not a question of standing, but of capacity." *Id.* at *4.

cannot "sue or be sued; any action for or against it must be brought by or against the executor[.]" *West*, *supra*, 1997 WL 559477 at *5.

All of these rules seem to presuppose the existence, upon the death of the decedent, of an estate, without regard to whether someone has purported to "open" the estate in probate court.

Furthermore, none of the cases the defendants cite actually held that opening an estate in probate court is a prerequisite to the creation or existence of a so-called "lawful estate." Rather, the cases hold only that: 1) the probate court must have subject-matter jurisdiction over an estate before it can appoint an administrator (Doc. 60 at 13–16); or 2) on a given set of facts, a decedent was or was not a resident of a particular county (*id.* at 16–17).

The district court in *Koho*, *supra*, 2015 WL 11198941, concluded in a similar case (though applying Washington law) that probate proceedings were not a prerequisite to the existence of a "lawful estate."

In *Koho*, the plaintiff filed a survivor claim on behalf of her decedent before a Washington probate court appointed her the estate administrator. 2015 WL 11198941 at *1. Moving to dismiss the complaint on subject-matter-jurisdiction grounds, defendants argued that "there was 'no plaintiff' at the time the case was filed." *Id.* According to the defendants, the decedent's "estate did not even exist" before the plaintiff opened the estate in probate court and received her appointment as estate administrator. *Id.*

Just like the defendants' argument here with respect to Ohio law, the defendants in *Koho* "cite[d] no case for the proposition that an estate does not exist – and is not injured – for purposes of Washington's survivorship statute until steps are taken to open the probate estate." *Id.* at *2.

As the district court explained, moreover, Washington law – like Ohio law here – "contemplate[d] that a decedent's estate can be 'injured' by harms that a defendant inflicts on the decedent while the decedent is still alive." *Id.* The necessary implication, the district court found, was that an estate must exist *before* the opening of a probate action; otherwise, an estate could never bring a survivor claim:

> If this estate does not even exist for the purposes of sustaining a lawsuit until some point after the decedent's death, then this estate could not be injured by a defendant's actions, and thus it could have no standing and no representative would ever have capacity to sue on its behalf.

*Id.*

Rejecting that illogical outcome, the court held that the decedent's estate "suffered injury in fact and existed for purposes of Washington law at the time that [he] died." *Id.*

So too here: Scott's estate existed at the time of death, and it suffered an injury in the form of, at the very least, the injuries before his death, *cf. Peters*, 115 Ohio St. 3d at 137, and, as well, his death itself, *cf. Jaco*, *supra*, 739 F.2d at 241–45. Because Scott's estate suffered an injury in fact, defendants' standing arguments, such as they are, do not undermine my subject-matter jurisdiction.

**B. Capacity**

"Capacity to sue or be sued under Rule 17(c) involves a party's personal right to litigate in federal court." *Fletcher*, *supra*, 2017 WL 690533 at *3.

Defendants' challenge to Richard's power to bring this suit on the estate's behalf implicates his capacity to sue. *See Koho*, *supra*, 2015 WL 11198941 at *2 ("Plaintiff's failure to become the representative of Ilich's estate is an issue of her capacity to sue, and not an issue of standing or subject-matter jurisdiction."); *accord Fletcher*, *supra*, 2017 WL 690533 at *3–6 (same); *Estate of Ponder*, *supra*, 2012 WL 1031487 at *4 (same).

14

Under Rule 17(b)(3), "the law of the state in which the district court sits governs a party's capacity." *Firestone v. Galbreath*, 976 F.2d 279, 283 (6th Cir. 1992). Accordingly, Ohio law determines whether Richard can sue on behalf of Scott's estate.

### 1. Ohio Law on Estate Administrators' Capacity to Sue

Because an estate lacks capacity to sue, it must act through an administrator or personal representative. *Peters*, *supra*, 115 Ohio St. 3d at 137; *Smith*, *supra*, 2014 WL 12591694 at *2. The administrator of an intestate decedent's estate must, in turn, receive his appointment from "the probate court of the county in which the decedent was a resident at the time of his death." O.R.C. § 2113.01.

The probate court's power to administer an intestate decedent's estate is a question of the court's subject-matter jurisdiction. *State ex rel. Lee*, *supra*, 83 Ohio St. 3d at 372–73. If the decedent was not a resident of the county in which the probate court sits, then that court lacks subject-matter jurisdiction over the estate. *Black*, *supra*, 2008-Ohio-7038 at ¶¶23–24. Any order issued by a probate court without subject-matter jurisdiction is a nullity, and any party affected by such an order – including an order appointing an administrator – may collaterally attack it. *See Ohio Pyro, Inc. v. Ohio Dep't of Commerce*, 115 Ohio St. 3d 375, 380 (2007) (describing collateral attacks in general); *Black*, *supra*, 2008-Ohio-7038, ¶23 (describing collateral attacks vis-à-vis probate courts purporting to exercise jurisdiction over a non-resident decedent's estate).[3]

---

[3] For these reasons, I reject Richard's arguments that this court has no power to examine the validity of his appointment. For one thing, Richard relies on inapposite cases discussing the "probate exception" to federal courts' subject-matter jurisdiction. That doctrine applies in diversity cases, not federal-question cases. For another, Richard relies on ancient Ohio cases that do not reflect the Ohio Supreme Court's current view that a party can collaterally attack an order of the probate court for lack of subject-matter jurisdiction.

## 2. Forfeiture

Defendants' challenge to Richard's ability to prosecute this suit implicates these rules.

They contend, with substantial evidentiary support, that Scott was not a Sandusky County resident when he died. If that were the case, then the Sandusky County Probate Court would have lacked subject-matter jurisdiction over Scott's estate, Richard's appointment would be a nullity, and he would not have the capacity to sue.

Richard disputes the merits of the defendants' arguments, but he also argues that defendants "waived any challenge" to his capacity to sue by failing to raise that issue as an affirmative defense in their answer. (Doc. 91 at 20).[4] He also notes that "[t]his case has proceeded for over two years without Defendants ever raising any issues related to" his capacity to sue. (*Id.*).

Defendants' primary response – that they cannot "waive" this issue because it implicates my subject-matter jurisdiction (Doc. 92 at 37) – has no merit. *See* pp. 7–14, *supra*.

But they also argue that Richard "sandbagged" them and the probate court by "misrepresent[ing]" Scott's residence. (*Id.* at 38). According to the defense, it did not learn until July and August, 2017, that Scott long ago moved out of his father's Bellevue residence – and thus that he was not a Sandusky County resident. (*Id.*). Because they moved to dismiss the case about three weeks after discovering that information, defendants deny that a forfeiture occurred.

Civil Rule 9(a)(2) provides that a party wishing to raise a lack-of-capacity challenge "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge."

---

[4] Although the parties frame the issue as one of waiver, it is really one of forfeiture: did defendants "fail to make the timely assertion of a right"? *U.S. v. Mabee*, 765 F.3d 666, 671 (6th Cir. 2014).

16

"'[A]lthough an objection to a party's capacity is not an affirmative defense, it can be analogized to an affirmative defense and treated as waived if not asserted by motion or responsive pleading.'" *Tri-Med Fin. Co. v. Nat'l Century Fin. Enters., Inc.*, 208 F.3d 215, *5 (6th Cir. 2000) (quoting 5 Wright and Miller, Federal Practice & Procedure § 1295 at 574 (2d ed. 1990)). "'Early waiver is necessary to give meaning to the requirement in Rule 9(a) that capacity must be put in issue by a specific negative averment.'" *Id.* (quoting 5 Wright and Miller, Federal Practice & Procedure § 1295 at 574 (2d ed. 1990)).

To the extent Richard argues that defendants forfeited the issue by not raising it in their answer, I disagree. Courts within the Sixth Circuit have held, and I agree, that it is permissible to raise a lack-of-capacity objection in a Rule 12 motion. *E.g.*, *Longwood, LLC v. Voegele*, 2018 WL 1660086, *5 (W.D. Ky. 2018) (collecting cases).

But the parties' briefs, which cite no relevant case law and address the issue only perfunctorily, do not permit me to make an informed decision on the forfeiture question. I will therefore order supplemental briefing on the question whether defendants forfeited their objection to Richard's capacity to sue.

The parties' briefs should cite and discuss Sixth Circuit cases, as well as district court cases from within the Circuit, addressing whether a party has forfeited its capacity objection. The parties may also discuss any persuasive out-of-circuit authority they deem appropriate.

In briefing the issue, the parties should keep in mind that, at least at present, I am inclined to find that the timing of the defense's motion weighs strongly in favor of forfeiture.

This is because defendants knew from the August, 2013, booking tapes that Scott claimed to reside in Brooklyn, Michigan. That information seems sufficient to have put them on notice that Scott may not have been a Sandusky County resident, and thus given them an ample basis to

challenge Richard's capacity much earlier in this litigation. And despite defendants' many, many assertions that Richard purposefully – and even fraudulently – misrepresented his son's residence to the Sandusky County Probate Court (Doc. 92 at 8, 10, 11, 12, 25, 30, 38, 42), the defendants have not cited a shred of evidence to substantiate their allegations. Nor have defendants bothered to explain why Richard would improperly and in bad faith turn to that court for power to administer his son's estate, given that no other member of Scott's family sought that power – and, indeed, when other family members who were entitled to administer the estate waived their rights to do so. (Doc. 63 at 30).

The parties' briefs should also address the question of prejudice and, as well, any other consideration relevant to the forfeiture inquiry.

Finally, if I decide that defendants did not forfeit their objection, and, further, that Scott did not reside in Sandusky County, Ohio, the next question would be the propriety of substituting the "proper" administrator of Scott's estate, whoever that may be, as the plaintiff in this case. The parties' briefs should therefore address whether such a substitution would be permissible and appropriate under Fed. R. Civ. P. 17(a)(3) and *Levinson v. Deupree*, 345 U.S 648 (1953).

**Conclusion**

It is, therefore,

ORDERED THAT:

1. Defendants' motion to dismiss for lack of subject-matter jurisdiction (Doc. 59) be, and the same hereby is, denied;

2. Plaintiff's opposition and motion for oral argument (Doc. 91) be, and the same hereby is, denied;

18

3. The parties must submit supplemental briefing on the issues raised on pages 17 and 18 of this order. Plaintiff's brief due August 15, 2018; defendants' response due August 29, 2018; and plaintiff's reply due September 5, 2018.

4. The parties' principal briefs may not exceed fifteen pages, and plaintiff's reply brief may not exceed seven pages.

So ordered.

/s/ James G. Carr<br>Sr. U.S. District Judge