# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# WESTERN DIVISION

Richard William Plate, Administrator of     Case No. 3:15CV1699
the Estate of Scott Allyn Plate,

    Plaintiff

    v.                                         **ORDER**

Charles Johnson, et al.,

    Defendants

This is a § 1983 case arising out of the death of Scott Allyn Plate, who died while in custody at the Lucas County, Ohio, Jail.

In a prior order, I denied the defendants' motion to dismiss for lack of subject-matter jurisdiction. *Plate v. Johnson*, 2018 WL 3569893 (N.D. Ohio 2018).

The defendants had argued that an Ohio probate court's order appointing Scott's father, plaintiff Richard Plate, to administer Scott's estate was a nullity because, at the time of Scott's death, he did not reside in the county in which the probate court sat. *Id.* at *1.[1] According to defendants, this meant that Scott's estate was "void *ab initio*" (Doc. 60 at 24), and that I lacked subject-matter jurisdiction over the case.

Disagreeing with those arguments, I concluded that the "validity of the appointment order affects only Richard's capacity to sue, and not my subject-matter jurisdiction." *Plate*, *supra*, 2018 WL 3569893 at *1.

---

[1] Only the probate court of the county in which a decedent resides at the time of his death has the authority to appoint an administrator. *See* O.R.C. § 2113.01.

For one thing, I had federal-question jurisdiction over Richard's § 1983 claims. *Id.* at *4–5. For another, what the defendants labeled challenges to my subject-matter jurisdiction were really challenges to "Richard's power to maintain this suit in light of the evidence suggesting that Scott did not reside in Sandusky County at the time of his death." *Id.* at *5.

To the extent that defendants' arguments implicated plaintiff's standing under Article III, I held that whether Richard had standing was irrelevant: Richard sued in his representative capacity and on behalf of the real party in interest, Scott's estate. *Id.* I then held that Scott's estate had standing because it "suffered injuries in fact – Scott's death as well as the injuries Scott suffered before he died – and it seeks, through its administrator, to recover the damages arising from those injuries that are traceable to defendants' conduct." *Id.* at *6.

In reaching the latter holding, I rejected the defendants' claim that Scott's estate did not exist – and thus lacked standing – because "the estate 'was not created in compliance with Ohio law.'" *Id.* at *5 (quoting Doc. 60 at 6).

Relying on Ohio cases describing the characteristics of a decedent's estate and, importantly, its ability to possess a "survivor claim for injuries that the decedent incurred before the decedent's death," I concluded that an estate exists "upon the death of the decedent . . . without regard to whether someone has purported to 'open' the estate in probate court." *Id.* at *7. Despite the defendants' sweeping claim that "[t]he single most fundamental aspect of every action brought by [an] estate . . . lies in the creation of the estate" in probate court (Doc. 60 at 13), "none of the cases the defendants cite[d] actually held that opening an estate in probate court is a prerequisite to the creation or existence of a so-called 'lawful estate.'" *Plate*, *supra*, 2018 WL 3569893 at *7.

Finally, after concluding that the validity of the appointment order affected only Richard's capacity under Fed. R. Civ. P. 17(c), I ordered supplemental briefing to determine whether the defendants forfeited their capacity challenge by raising it for the first time after more than two years of litigation. *Id.* at *8–10.

Pending are the defendants' motion to certify my order for interlocutory appeal (Doc. 95) and the parties' briefs on the forfeiture question.

For the following reasons, I deny the motion to certify.[2] I also hold that the defendants did not forfeit their capacity objection. I then find that Scott was not a resident of Sandusky County when he died, and that Richard lacks capacity to sue on the estate's behalf. Finally, I hold that Richard is entitled to substitute the correct administrator under Fed. R. Civ. P. 17(a)(3).

### A. Certification

Under 28 U.S.C. § 1292(b), I have "first line discretion" to certify an interlocutory order for immediate appeal. *Turi v. Main St. Adoption Servs., LLP*, 633 F.3d 496, 504 (6th Cir. 2011).

Certification is appropriate if the order "(1) involves a controlling question of law, (2) as to which there is a substantial ground for difference of opinion, and (3) . . . an immediate appeal from the order may materially advance the ultimate termination of the litigation." *In re Buccina*, 657 F. App'x 350, 351 (6th Cir. 2016).

Defendants contend that the controlling question of law here is whether I have subject-matter jurisdiction even though "the plaintiff estate did not exist as a matter of Ohio law at the time [the lawsuit was filed]." (Doc. 95 at 8).

---

[2] As I show below, the certification motion is, in fact, nothing more than a motion for reconsideration by another name, and a baseless one at that. There is simply no plausible basis to think the Sixth Circuit would accept an interlocutory appeal of my prior order, which turns on a longstanding principle of Ohio probate law. Further meritless motions for reconsideration will result in a show-cause order under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927.

This question involves an application of the well-established, and in this case unquestioned, principle that when "a plaintiff admittedly has not suffered injury in fact by the defendants, it ha[s] no standing" to sue or "*to make a motion to substitute the real party in interest.*" *GMAC Mortg., LLC v. McKeever*, 651 F. App'x 332, 337 (6th Cir. 2016) (emphasis supplied)**.**

Because Richard opened Scott's estate in the wrong probate court, so defendants' argument goes, the estate does not exist and does not have Article III standing. In light of cases like *GMAC Mortgage*, the argument continues, the estate likewise has no standing to seek substitution of the proper plaintiff – presumably another administrator appointed by a probate court with jurisdiction over Scott's estate.

While I agree with the defense that questions about my subject-matter jurisdiction may be "controlling," *e.g.*, *Deutsche Bank Nat'l Trust Co. v. Weickert*, 638 F. Supp. 2d 826, 831 (N.D. Ohio 2009) (Zouhary, J.), I disagree that this case actually presents the supposed controlling question that the defendants identified.

This is so, because the issue that the defendants have proposed for appeal begs a critical question on which my decision denying the motion to dismiss turned: whether Scott's estate existed when this suit began.

My holding that the estate existed upon Scott's death, and without regard to whether someone "opened" the estate in the proper probate court, rested principally on the Ohio cases discussed in the opinion, *see Plate*, *supra*, 2018 WL 3569893 at *5–7, and, as well, on out-of-circuit cases reaching the same conclusion on very similar facts, *e.g.*, *Koho v. Forest Labs, Inc.*, 2015 WL 11198941, *2 (W.D. Wash. 2015).

4

But I also emphasized that the defendants had not cited a single case, statute, or rule suggesting (let alone holding) otherwise.

I have reexamined this issue in light of defendants' certification papers, which again cite no Ohio cases holding that a trip to probate court is a necessary prerequisite to the creation or existence of a decedent's estate. (Doc. 95 at 1–12; Doc. 98 at 2–3, 5–13).

Having done so, I adhere to my original determination that Scott's estate, which is "simply the name the law gives to a decedent's collections of assets and liabilities," *Plate*, *supra*, 2018 WL 3569893 at *7, existed when he died, without regard to whether his father first opened the estate in the correct probate court.

Further research has not only reinforced my conclusion,[3] but also established that the defendants' position confuses the existence of an estate with the period during which the estate is "open." *See Eger v. Eger*, 39 Ohio App. 2d 14, 18 (1974) (in a case involving the executor's duty to include all of the decedent's assets in an estate, the court distinguished between the estate itself and "the time the estate is open," which is the period "from the date of the issuance of letters testamentary or letters of administration and the appointment of an administrator or executor until the executor files a final account and is discharged") (internal citations omitted).

Because Scott's estate existed when this suit began, and because it suffered injuries in fact, *see Plate*, *supra*, 2018 WL 3569893 at *6, it had standing to sue, just as it has standing to

---

[3] That an estate comes into existence automatically upon a decedent's death is a premise of many Ohio cases. *See, e.g.*, *Bayes v. Dornon*, 37 N.E.3d 181, 188 (Ohio App. 2015) ("if a defendant takes a person's money after that person died . . . meaning that an estate was in existence at the time the money was taken, then a concealment action is proper"); *State v. Webber*, 163 Ohio St. 598, 603 (1955) ("the obligation against the mother for the son's support arose before and not after her death and consequently became automatically a debt of her estate upon her death"); *In re Estate of Perry*, 1989 WL 47863, *2 (Ohio App. 1989) (resolving a dispute over whether certain property belonged to the decedent's estate, even though decedent "died intestate . . . and no administration was ever filed for her estate").

move for a substitution under Rule 17. For that reason, this case does not actually present the controlling question of law that the defendants want certified for interlocutory appeal.

**B. Forfeiture**

Fed. R. Civ. P. 9(a)(2) requires that a party wishing to challenge another's "capacity to sue or be sued" "must do so by a specific denial, which must state any supporting facts that are peculiarly within the party's knowledge."

As I explained in *Plate*, *supra*, 2018 WL 3569893 at *9, a party that unduly delays in raising a lack-of-capacity challenge may forfeit its right to make that challenge.

On my pass through the parties' initial briefs, I was "inclined to find that the timing of the defense's motion weighs strongly in favor of forfeiture." *Plate*, *supra*, 2018 WL 3569893 at *10. That was so because the defense had evidence in its possession since Scott's death, in August, 2013, suggesting that Scott did not reside in Sandusky County, but did not challenge Richard's capacity until September, 2017.

Having read the parties' supplemental briefs, however, I now recognize that my initial impression was mistaken.

The evidence at issue consisted of videotaped recordings of Scott telling two different booking officers at the Lucas County Jail, on the day before his death, that he lived in Brooklyn, Michigan. *Plate*, *supra*, 2018 WL 3569893 at *2.

But as the defendants have properly pointed out, Richard has represented throughout this litigation – and the public record has corroborated his representations – that Scott was a resident of Bellevue, Ohio, which is within Sandusky County. Scott's death certificate states that Scott resided in Bellevue. (Doc. 73–5 at 2). Letters of administration from the Sandusky County Probate Court reflected that Scott was "domiciled in Sandusky County" when he died. (Doc. 91–

6

2 at 2). And Richard's responses to the defendants' interrogatories stated that Scott resided in Bellevue at the time of his death. (Doc. 106–2 at 1).

Defendants have explained without contradiction, moreover, that it was only in late March, 2017, that they developed evidence casting doubt on Scott's residency in Sandusky County. (Doc. 106 at 11).

First, during the deposition of Scott's mother Susan, she testified that Scott had moved to Brooklyn, Michigan in the Spring of 2013. (*Id.*).

Then, because it was Richard who represented to the Probate Court that his son resided in Sandusky County, defendants sought to depose him and conduct targeted discovery as to Scott's residence. The docket reflects that defendants issued fifteen subpoenas (to banks, medical providers, and a homeless shelter) between mid-May and mid-July, 2017, in an effort to track down records of where Scott was residing when he died. (Docs. 36–47, 49–50, 55).

After a series of understandable delays (Doc. 106 at 11–12), Richard's deposition finally went forward on July 11, 2017. When Richard testified, *inter alia*, that Scott had ceased living with him in April, 2013, and that Richard also traveled as part of his work (which suggested that he might not have personal knowledge of his son's whereabouts during those travels), defendants sought to depose his wife, Peggy Plate. During her deposition in mid-August, Peggy testified that Scott had not lived in Bellevue for several months before he died. (*Id.* at 12).

Defendants then filed their motion to dismiss on September 5, 2017, some three weeks after that last deposition.

The course of events adequately explains why the defendants raised the capacity issue only in September. 2017. Most simply put, they reasonably relied on Richard's representations – both in this litigation and those he made to the probate court – that Scott was a Sandusky County

resident. Only when a more definitive basis for questioning Richard's representations emerged in April, 2017 did the defendants have substantial grounds to question Scott's residency in Sandusky County. Defendants then expeditiously undertook discovery to support their position and brought the issue to my attention only four-and-a-half months later.

That was not undue delay, and defendants have not forfeited their capacity challenge.

### C. Scott's Residence and Richard's Capacity to Sue

"Under Rule 17(b)(3), the law of the state in which the district court sits governs a party's capacity." *Plate*, *supra*, 2018 WL 3569893 at *8 (internal quotation marks omitted). Ohio law therefore "determines whether Richard can sue on behalf of Scott's estate." *Id.*

### 1. Ohio Law of Residency

As I explained in *Plate*, *supra*, 2018 WL 3569893 at *8, whether Richard has capacity to sue depends on whether Scott was a resident of Sandusky County when he died:

> Because an estate lacks capacity to sue, it must act through an administrator or personal representative. *Peters*, *supra*, 115 Ohio St. 3d at 137; *Smith*, *supra*, 2014 WL 12591694 at *2. The administrator of an intestate decedent's estate must, in turn, receive his appointment from "the probate court of the county in which the decedent was a resident at the time of his death." O.R.C. § 2113.01.
>
> The probate court's power to administer an intestate decedent's estate is a question of the court's subject-matter jurisdiction. *State ex rel. Lee*, *supra*, 83 Ohio St. 3d at 372–73. If the decedent was not a resident of the county in which the probate court sits, then that court lacks subject-matter jurisdiction over the estate. *Black*, *supra*, 2008-Ohio-7038 at ¶¶23–24. Any order issued by a probate court without subject-matter jurisdiction is a nullity, and any party affected by such an order – including an order appointing an administrator – may collaterally attack it. *See Ohio Pyro, Inc. v. Ohio Dep't of Commerce*, 115 Ohio St. 3d 375, 380 (2007) (describing collateral attacks in general); *Black*, *supra*, 2008-Ohio-7038, ¶23 (describing collateral attacks vis-à-vis probate courts purporting to exercise jurisdiction over a non-resident decedent's estate).
>
> The critical question, then, is whether Scott was a resident of Sandusky County.

"A residence has been defined as a place of dwelling, and it requires[ ] the actual physical presence at some abode coupled with an intent to remain at that place for some period of time." *In re Anderson*, 2007-Ohio-1107, ¶21 (Ohio App. 2007) (internal quotation marks omitted). "[T]he term residence connotes an element of permanency rather than a location where one simply visits for a period of time." *Id.* (internal quotation marks omitted); *see also Le Sueur v. Robinson*, 53 Ohio App. 3d 9, 12 (1988) (calling this definition "well-settled").

Residency is not, however, the same as domicile. *State ex rel. Lee v. Trumbull Cnty. Probate Court*, 83 Ohio St. 3d 369, 373 (1998).

"Domicile connotes a[ ] fixed, permanent home to which one intends to return and from which one has no present purpose to depart." *In re Anderson*, *supra*, 2007-Ohio-1107 at ¶20 (internal quotation marks omitted). For that reason, an individual may have only one domicile, even though he "may have several residences." *In re Guardianship of Fisher*, 91 Ohio App. 3d 212, 215 (1993); *see also id.* ("a residence is something less than one's domicile").

### 2. Scott Did Not Reside in Sandusky County

Scott died at the Lucas County Jail on August 25, 2013. (Doc. 73–5 at 2). The evidence in the record establishes that Scott was not then, and had not been for at least four months, a resident of Sandusky County, Ohio.

Scott last lived in Bellevue for a two-week period beginning in early April, 2013. (Doc. 63 at 16–17). He moved into his father's home there after completing a thirteen-month stay at a physical-rehabilitation facility in Waterville, Ohio. (*Id.* at 77, 82).

After the two-week stay in Bellevue, Scott took a job in Michigan and moved into his mother's home in Brooklyn, Michigan. While in Michigan, "Scott received mail at his mother's house, opened a bank account at a Bank of America branch in Brooklyn, and bought and

registered a car in Brooklyn." *Plate*, *supra*, 2018 WL 3569893 at *2 (internal citations omitted). "All of the paperwork associated with these events indicates that Scott considered his then-current address to be his mother's home in Brooklyn." *Id.*

It appears that Scott continued to live in Michigan through at least early June, 2013 (a police report indicates that he was arrested in Jackson on June 9). (Doc. 63 at 84). Scott returned to Bellevue only twice, and only for short visits: on one occasion he visited his father to show him his new car, on the other to introduce Richard to his new boss. (*Id.*).

Where Scott actually resided from early June until his death on August 25, 2013 is admittedly a difficult question.

Scott may have been homeless during some or all of this time; he spent several nights in motels; and he received emergency medical care in Toledo and Port Clinton, Ohio (which is within Ottawa County). *Plate*, *supra*, 2018 WL 3569893 at *2. Associated records only complicate the matter, indicating variously that Scott was homeless, lacked a "local residence," had moved out of Ohio, or resided in Bellevue. *Id.*; (Doc. 91–16 at 2).

Then, on his two admissions to the Lucas County Jail on the day before he died, Scott twice said that he lived in Brooklyn, Michigan. (Doc. 64). Scott may have been intoxicated during the first intake, however, when he also told the officers that his name was "Erick Platte,"[4] which was his brother's name. (*Id.*).

But an easy answer to the question of Scott's residence is that it was not in Sandusky County.

Richard nevertheless maintains that Scott resided in Sandusky County because: 1) he had an apartment in father's home; 2) he kept important possession there; and 3) his primary doctor

---

[4] This is how Scott spelled his name for the officers. During his second intake at the jail, the officers referred to Scott as "Mr. Plate" without using a first name. (Doc. 64).

was based in Bellevue. (Doc. 91 at 10). Richard also notes that Scott gave the Bellevue address several times while receiving medical care in July and August, 2013. (*Id.* at 11).

Even accepting this evidence as true, it does not establish Scott's "actual physical presence at some abode" in Sandusky County in the weeks and months before his death. *In re Anderson*, *supra*, 2007-Ohio-1107 at ¶21. There is simply no evidence that Scott ever returned to his father's home after the two-week stay in April and the two brief visits shortly thereafter.

Furthermore, that Scott may have had an apartment at Richard's home and kept some belongings there does not establish the second requirement of residency: "an intent to remain at that place for some period of time." *Id.* On the contrary, Scott left Richard's house and moved in with his mother in Michigan, apparently in aid of establishing his life there and starting a new job.

Finally, I give little weight to Scott's representations in July and August as to where he lived. The conflicting representations are just that, and they establish that Scott told different people different things when, at different times, someone asked him where he lived.

For all of these reasons, I find that Scott did not reside in Sandusky County, Ohio at the time of his death. That means that the Sandusky County Probate Court had no jurisdiction to appoint Richard (or anybody else) to administer Scott's estate. *State ex rel. Lee*, *supra*, 83 Ohio St. 3d at 372–73; *Black v. Aristech Chem. Co.*, 2008-Ohio-7038, ¶23 (Ohio App. 2008). Consequently, Richard lacks capacity to sue on behalf of Scott's estate.

### D. Rule 17 Substitution

Federal courts "may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3). "After

11

ratification, joinder or substitution, the action proceeds as if it had been originally commenced by the real party in interest." *Id.*

This rule is "'designed to avoid forfeiture and injustice when an understandable mistake has been made in selecting the party in whose name the action should be brought.'" *Fieldturf USA, Inc. v. Astroturf, L.L.C.*, 2015 WL 13047566, *3 (E.D. Mich. 2015) (quoting 6A Wright and Miller, *Federal Practice & Procedure* § 1555 (3d ed. 2010)).

"'A Rule 17(a) substitution of plaintiffs should be liberally allowed when the change is merely formal and in no way alters the original complaint's factual allegations as to the events or the participants.'" *Wright v. Linebarger Googan Blair & Sampson, LLP*, 782 F. Supp. 2d 593, 615 (W.D. Tenn. 2011) (quoting *Zurich Ins. Co. v. Logitrans, Inc.*, 297 F.3d 528, 534 (6th Cir. 2002) (Gilman, J., concurring)).

The defendants maintain that a Rule 17 substitution is improper. In their view, Richard's mistake – believing that his son resided in Sandusky County at the time of his death, and turning to the Sandusky County Probate Court for letters of authority – was not "understandable," such that Rule 17 precludes a substitution of parties. (Doc. 106 at 19).

According to the defense, Scott's decedents were "well aware of and in possession of all of the evidence demonstrating that [Scott's] residence was not in Sandusky County[.]" (*Id.*). Defendants also argue that Richard retained counsel nearly two years before filing this suit, which should have given counsel "more than ample time to investigate, meet with the family and determine the appropriate jurisdiction to open the estate." (*Id.* at 19).

Respectfully, I cannot agree with the defendants. To deny Richard a substitution on these grounds would work a forfeiture of the estate's claims. To dismiss the suit now simply because the wrong nominal party filed the suit, when the real party in interest – Scott's estate – has been

12

part of the case all along, would work a manifest injustice. Because Rule 17(a) condemns rather than condones that result, I will permit Richard to substitute the estate's correct administrator.

### 1. The Mistake Was an "Understandable" One

First, while I have serious misgivings about requiring Richard to prove that his mistake was "understandable" – in addition to being "honest" – in order to obtain a substitution, *see Esposito v. U.S.*, 368 F.3d 1271, 1275–77 (10th Cir. 2004),[5] the record shows that he had some plausible and understandable basis to turn to the Sandusky County Probate Court.

Scott had, after all, lived with him for two weeks in April, 2013, and he kept some possessions at Richard's house. Medical records generated in the weeks before his death indicated that Scott told some third parties that he resided at the Bellevue home. Scott's death certificate also listed Scott's address as a Bellevue address. Scott's family members did not object when Richard represented in his application to be appointed the estate administrator that Scott resided at the Bellevue home.

Given these circumstances, Richard might reasonably and understandably have believed that Scott did reside in Bellevue.

---

[5] The "understandable mistake" language appears, not in the text of Rule 17 itself, but in the Advisory Committee Note respecting the Rule's 1966 Amendment. Nor does any Sixth Circuit case require the movant to prove that its mistake was "understandable." The Note explains that the amendment was "intended to insure against forfeiture and injustice – in short, to codify in broad terms the salutary principle of *Levinson v. Deupree*, 345 U.S. 648 (1953), and *Link Aviation, Inc. v. Downs*, 325 F.2d 613 (D.C. Cir. 1963). But neither of those cases focused on whether the movant made an "understandable" mistake in commencing suit in the name of someone besides the real party in interest. I make these observations to point out that an overemphasis on the "understandable" nature of the mistake might permit ambiguous language in the Note to take away with one hand what the text of the Rule, and other, clearer language in the Note, grant with the other: a liberal policy of allowing substitutions when an honest mistake has been made.

Richard is a layman, moreover, not a lawyer. It may very well be then that he truly and honestly believed that Scott resided in Bellevue, and that he did not appreciate the subtleties inherent in Ohio's law definition of a "residence."

To be sure, as the defendants point out, Richard had counsel before he purported to open Scott's estate in Sandusky County. But what Richard told his attorneys, and what those attorneys did with that information, represent a black box into which I cannot see, and which the defendants' briefs have not penetrated.[6] Accordingly, speculation about what counsel might have known and what she should have done is no basis on which to deny Richard a Rule 17 substitution.

In any event, the case law on which defendants rely establishes that Richard's mistake is not so inexplicable as to preclude a Rule 17 substitution.

For example, defendants cite *In re Engle Cases*, 767 F.3d 1082 (11th Cir. 2014), for the proposition that "Rule 17(a)(3) isn't a plenary license to fix 'pleading errors' in all cases for all reasons." (Doc. 106 at 18).

In *Engle*, however, the plaintiffs' attorney filed 588 personal-injury actions "on behalf of purportedly living cigarette smokers who, as it turns out, were dead at the time of filing." 767 F.3d at 1086. Affirming the district court's refusal to permit a Rule 17 substitution, the Eleventh Circuit emphasized that plaintiffs' counsel – who confessed to not investigating the facts underlying any of the hundreds of suits he filed – had tried to use Rule 17 to do exactly what the

---

[6] It is not clear from the defendants' brief whether the attorney(s) Richard retained two years before filing the § 1983 suit were the same attorneys who represented him in the probate court and ultimately filed this federal suit. In particular, I note that the attorney who represented Richard in probate court told the court that "[t]his case was just brought to counsel last week on Friday, August 7," eleven days before the attorney filed the application. (Doc. 63 at 29). Because Richard's representation by counsel does not show that his mistake was not understandable, I need not pursue the issue any further.

14

Rule forbade: "file placeholder actions . . . to keep a limitations period open while they investigate their claims and try to track down the proper parties." *Id.* at 113.

But that is a far cry from this case, where the § 1983 claim had been investigated (Doc. 63 at 29), the real party in interest – Scott's estate – was known, and Richard sought – and indeed without objection obtained – his appointment from a probate court that plausibly appeared to have jurisdiction over Scott's estate.

Nor do *Bell v. Mine Safety Appliances*, 2015 WL 10939715 (W.D. Ark. 2015), and *In re Peregrin*, 2012 WL 5939266, *5 (Bankr. N.D. Ill. 2012), help the defendants.

In these cases, the courts refused to grant a Rule 17 substitution because the plaintiffs had tried to file claims that the relevant body of substantive law unequivocally barred them from filing. *Bell*, *supra*, 2015 WL 10939715 at *3 (heirs tried to file products-liability claim that, as a matter of Alabama law, belonged only to estate); *Peregrin*, *supra*, 2012 WL 5939266 at *3–5 (debtor tried to file adversary proceeding that only bankruptcy trustee could file).

That is not the situation here. Whether a decedent resided in a given county is a highly fact-specific question under Ohio law, and the facts here gave Richard at least a plausible or understandable basis to believe that his son resided in Sandusky County.

### 2. The Mistake Was an Honest One

Second, there is no question that Richard's mistake was "honest."

In my earlier order, I emphasized that the defendants had not cited "a shred of evidence to substantiate" their "many, many assertions that Richard purposefully – and even fraudulently – misrepresented his son's residence to the Sandusky County Probate Court[.]" *Plate*, *supra*, 2018 WL 3569893 at *10. I also pointed out the implausibility of that contention, noting that

15

Richard had opened the estate for the sole purpose of pursuing the § 1983 claim, and that "other family members who were entitled to administer the estate waived their rights to do so." (*Id.*).

Defendants' supplemental brief does not renew that argument or cite any evidence of Richard's bad-faith maneuvering, so there is no basis to conclude that Richard's mistake was anything but honest.

### 3. No Prejudice to the Defendants

Third, defendants do not claim, nor could they do so plausibly, that substituting the correct administrator of Richard's estate would prejudice them.

By virtue of Richard's filing this suit more than three years ago, defendants are now, and have long been, on notice of the estate's claims.

It bears emphasizing, moreover, that "it is not the administrator of the estate that is important to the case. The real part[y] in interest" is Scott's estate, *Estate of Smith v. Hamilton Cnty. Dep't of Job & Family Servs.*, 2007 WL 2572184, *5 (S.D. Ohio 2007), and the estate has been in the case since the beginning. The requested substitution therefore amounts to correcting a purely technical error, and the lack of prejudice weighs heavily in favor of permitting the requested substitution. *See Zurich Ins. Co.*, *supra*, 297 F.3d at 534 (Gilman, J., concurring) ("A plaintiff's vigilance, however, is not the only consideration under Rule 17(a). In particular, lack of prejudice to the opposing party should also be taken into account in considering a Rule 17(a) motion, because the Rule is intended to insure against forfeiture and injustice.") (internal quotation marks omitted).

\* \* \*

For all of these reasons, I grant Richard's request to substitute the correct administrator of Scott's estate as the plaintiff in this case.

**Conclusion**

The court holds today that Richard lacks the capacity to sue on behalf of Scott's estate, even though the Sandusky County Probate Court appointed him to administer the estate. I recognize that this order injects uncertainty into the case, just as I recognize that the order necessarily raises the potentially difficult question of the proper forum for opening Scott's estate.

By now the parties have to understand, as I clearly do, that that issue is impossible of resolution to complete certainty. It is time, however, for the procedural skirmishing to end, and to move ahead expeditiously to a determination on the merits.

While I do not and cannot answer the venue question, I can and do expect that defendants will work with the estate's counsel to ensure that Scott's estate is opened in what appears, under all the circumstances, to be the most appropriate forum. This cooperation should include, at a minimum, good-faith efforts to resolve any further questions regarding the appropriate forum without further litigation. All other considerations being equal, defendants should give heed to the wishes of Scott's survivors.

This case has essentially been on pause since November, 2017, when I stayed proceedings to decide the defendants' motion attacking my subject-matter jurisdiction. (Doc. 86). Now that I have explained why I have such jurisdiction, and now that I have identified the deficiency in Richard's ability to sue – a deficiency that is technical in every sense of the word – the parties must work expeditiously to resolve the capacity issue so that the case can proceed with whatever discovery remains, dispositive motions, if appropriate, settlement discussions, and/or trial.

It is, therefore,

ORDERED THAT:

1. Defendants' motion to certify an order for interlocutory appeal (Doc. 95) be, and the same hereby is, denied.

2. Richard's motion for a Rule 17(a)(3) substitution be, and the same hereby is, granted. Within ninety days of the date of this order, the correct administrator of Scott's estate must file an amended complaint naming himself, herself, or itself as the plaintiff.

3. Within seven days of the date of this order, Richard must file a copy of this order with the Probate Court of Sandusky County, Ohio, and, as well, provide a copy of the order to the Common Pleas Judge who is presiding over Scott's probate case.

4. Plaintiff's counsel must file status reports with this court if the Sandusky County Probate Court takes any action in Scott's probate case on account of, or related to, this order finding that Scott did not reside in Sandusky County when he died.

5. Within fourteen days after the filing of the amended complaint naming the correct administrator of Scott's estate, the parties must file a joint status report discussing: 1) the status of discovery; 2) the suitability of the case at that time for either settlement/mediation discussions or dispositive-motion briefing; and 3) any outstanding issues in need of resolution by the court. On receipt of the status report, the clerk will set this case for a telephonic status/scheduling conference.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge